**IN THE UNITED STATES DISTRICT COURT FOR THE STATE OF MARYLAND**
**GREENBELT, MARYLAND**
**CIVIL DIVISION**

APR 2 7 2020

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

| | |
|---|---|
| **ANTONETTE JEFFERSON** | ) |
| | ) |
| **V.** | ) |
| | ) |
| **STATE BOARD OF LAW EXAMINERS,** | ) |
| **et al.** | ) |
| | ) |

P✕ **20 CV 1068**

## COMPLAINT

**COMES NOW I**, Antonette Jefferson, by and through self as counsel pro se and respectfully file this Complaint against the Character Committee for the Fourth Circuit, the MD State Board of Law Examiners, and the staff of the MD State Board of Law Examiners.  In support thereof, I state that the Character Committee and State Board of Law Examiners findings and conclusions contained material errors and omissions, that the recommendation of the Character Committee and State Board of Law Examiners were clearly erroneous and an abuse of discretion, the Character Committee and State Board of Law Examiner's failure to state non-discriminatory reasons for its recommendation was clearly erroneous and the application of the factors regarding admission were not set forth and the implications in the respective reports were clear error and an abuse of discretion.

### PARTIES

I hereby state the parties to this matter are as follows:

1.  Antonette Jefferson, Plaintiff, is a resident of Washington, DC.

2.  The Maryland State Board of Law Examiners is a resident of Maryland.

3.  The Character Committee for the Fourth Circuit is a resident of the State of MD.

JURISDICTION

4.  This court has jurisdiction over the matter pursuant to the 28 U.S. Code § 1331 and 28 U.S. Code § 1332.

FACTS

1.  That on or about February 2014, I took the Maryland Bar Exam.

2.  That on or about April 2014, I interviewed with the Character Committee.

3.  That upon arriving, the staff was rude and condescending, essentially ignoring my presence there in the office and holding side-bar conversations.

4.  That I disclosed all matters to the MD Bar.

5.  That it was stated in the interview that I may or may not be subjected to a hearing.

6.  That on or about May 2014, I received Bar results that I was unsuccessful on the Bar.

7.  That I performed in the top 50% of test-takers on the MBE portion of the Bar Exam.

8.  That at this time, I disclosed a disciplinary hearing at GW Law, a traffic offense for speeding and a charge that had been nolle prosequi'd and dismissed for simple assault.

9.  That all of these issues stemmed from a mental health issue, where the traffic offense occurred shortly before diagnosis, the simple assault at the time of the manic episode, and the disciplinary hearing upon the first attempt at de-titration from medicines under the advisement of medical professionals (not my primary physician because he was not present at the time I arrived) at the DC Department of Mental Health.

10. That from 2014 to 2016, I was engaged in a full-blown manic episode.

11. That during the time of the manic episode, I corresponded with the MD Bar staff, including Angela Brennan, Jeffrey Shipley, and Terry Davidson.

12. That during this time, I called the MD Bar several times.  That I also spoke with Terry Davidson, who sent several correspondences.

13. That she was rude, patronizing and condescending, interrupting when I was speaking and attempting to hand hold through matters of the Bar which a reading of the procedures would provide advisement with an opportunity to ask questions.

14. That initially upon learning that I was unsuccessful on the MD Bar, and in a manic episode, I appeared at the MD Court for the swearing in ceremony to be sworn in and challenge the exam results.  I spoke to several people and tried to challenge the results on the day and at the place of the ceremony.

15. That my actions were consistent with being in a manic episode.

16. That I finished the MD Bar 15 minutes early in February 2014.

17. That in an abundance of caution, I sent a letter to the Bar because the shoes I wore made a loud noise as I exited the test location and I did not intend to interrupt other test-takers.

18. That during this time I corresponded and communicated with the DC Bar.

19. That I cc'd several people not immediately relevant to my matters with the DC Bar, including cc'ing the MD Bar when I corresponded with the DC Bar during the manic episode.

20. That I experienced several institutionalizations for multiple months in total from 2014-2016.

21. That I took the Bar again in 2017 as a practice exam for February 2018.

22. That I primarily sat for the exam to determine the work needing to be done mentally, emotionally, and in terms of academic preparation for the next administration of the exam.

23. That I was unsuccessful on the July 2017 MD Bar Exam.

24. That because I was using the test as a proxy, I was prepared for the results.

25. That from 2016-to present, I have engaged in significant rehabilitative work.

26. That I took and passed the MD Bar in February 2018, results on May 4, 2018.

27. That I had a hearing before the MD Character Committee on or about March 2019.

28. That findings of fact and conclusions of law were made. The findings were erroneous in part. The conclusion(s) was against the weight of the evidence.

29. That I had a hearing before the SBLE on or about October 2020.

30. That the SBLE made findings of fact and conclusions of law that were erroneous.

31. That two of the committee members were laughing and sharing side bar conversations during the proceeding. When I looked in their direction, they ceased the jesting. To be clear, it appeared that they had made a decision and were having a laugh before considering all of the evidence.

32. That I made a request for an extension of time to take the Oath for good cause.

33. That the Board, without reason, denied the request for an extension.

34. That I called the Board to inquire about whether a withdrawal of the application on the basis of Character and Fitness counted toward the attempt limit and was given an evasive answer.

35. That at the time of passing the Bar in February 2018, my record had been impacted by the manic episode occurring from 2012-2016.

CLAIMS
Discrimination
Race, Gender, Disability
Federal Civil Rights Act
Maryland Commission on Civil Rights

36. The State Board of Law Examiners' staff were discriminatory, condescending, rude, patronizing and poisoned the Board's and Committee's evaluation of my application. The animus was discriminatory and the motivations quite probably jealousy and incredulity although jealousy and discrimination cannot be easily described as emotions of rationality and thus proof must be discerned from the circumstances.

37. The Character Committee made findings in this matter, but the conclusion was inconsistent with the evidence and weight of the evidence.

38. The State Board of Law Examiners selectively and discriminatorily credited testimony that was favorable to its conclusion concerning mental health rather than considering and crediting the favorable content of the medical evidence presented.

39. The State Board of Law Examiners erred in stating that Petitioner had several diagnoses in support of a conclusion when all written medical correspondence and letters, consistent with Petitioner's testimony, gave one specific diagnosis.

40. The State Board of Law Examiners erred in failing to accord due credit to Petitioner's career accomplishments and volunteer work, giving cursory reference to said work.

41. The State Board of Law Examiners bolstered its conclusion and erred in equivocating over Petitioner's career, work, and volunteer accomplishments, and erred in emphasizing an unfavorable and inaccurate current state of Petitioner's health and compounded the diagnosis in contravention of the evidence.

42. The State Board of Law Examiners erred by not according due credit and being generally dismissive to Petitioner's medical letters and evidence.

43. The State Board of Law Examiners erred by omitting that the titration process occurred while working with medical personnel and that such prescriptions and dosages could only be provided by medical personnel, thus evidencing that the titration process was not embarked upon independent of the consent of medical personnel.

44. The State Board of Law Examiners erred in omitting the ultimate recommendation of all medical evidence and dismissing the ultimate conclusions of the medical evidence that I am equipped to practice.

45. The State Board of Law Examiners erred in not according credit to all of the accomplishments achieved in the most recent four years of recovery and rehabilitation, evidencing that the progress indicated in the medical evidence was consistent with a pattern of good and solid discretionary decisions rather than just one "good day."

46. The State Board of Law Examiners erred in using a ten-year window as the litmus test for rehabilitation when a shorter time allocation is sufficient in the matter of a mental health diagnosis and in also considering the many accomplishments and the intense concentrated effort toward rehabilitate above and beyond everyday conduct engaged in by Petitioner.  Further, the committee presumably admits younger applicants (based on the average age of law students) who may not have yet had significant life experiences, and has rendered an adverse decision concerning Petitioner, although Petitioner's likelihood of practicing ethically is at least equivalent to other applicants.

47. The State Board of Law Examiners erred in stating that Mental Health is equivalent to general Character issues and therefore erred in holding Petitioner to an inappropriate

standard and the State Board failed to consider Petitioner's application with new consideration independent of the Character Committee's conclusion.

48. The State Board of Law Examiners erred in minimizing and omitting the circumstances of the criminal cases and failed to state that all criminal cases were dismissed and further failed to accord credit to Petitioner for the effort expended to have all matters dismissed.

49. The State Board of Law Examiners erred in not according credit to Petitioner for managing the stresses and problems associated with mental health for approximately ten years post-diagnosis without issue.

50. The State Board of Law Examiner erred in failing to accord credit to Petitioner for early years of accomplishment pre-diagnosis, indicating the nature and general substance of Petitioner's Character.

51. The State Board of Law Examiners erred in discriminatorily using the intersection of race, gender, and age as a general proxy for ability to manage a mental health diagnosis instead of considering the actual and favorable facts concerning Petitioner's management of mental health and resultantly did not accord credit to Petitioner for the hard work and effort expended in managing a mental health diagnosis for nearly twenty-years.

52. The State Board of Law Examiners erred in failing to accord credit to Petitioner in finding that side-effects were a legitimate reason to attempt to titrate and that said titration was conducted responsibly and that the withdrawal symptoms could not be totally predicted and thus should not negatively reflect on Petitioner's ability to manage a mental health diagnosis.

53. The State Board of Law Examiners erred in not according credit to Petitioner for navigating numerous stressful situations and the suggestion regarding Petitioner's

stability based on the timing of emails and transmission of emails sent to the Board was clearly erroneous and an abuse of discretion.

54. The State Board of Law Examiners erred in not according credit to Petitioner and in minimizing or otherwise omitting from the report the details of Petitioner's charitable giving, volunteer work, religious activity, helping family, character references, generally successful management of mental health, successful (working in cooperation with GW Law) navigation a disciplinary hearing, physical health and wellness activities, marriage, and stress management through numerous court proceedings.

55. The State Board of Law Examiners erred in not according credit to Petitioner for work conducted in the law and navigating numerous and various legal situations and court proceedings.

56. The State Board of Law Examiners erred in considering civil court cases as a reason to challenge admission given the circumstances of those civil cases.

57. The State Board of Law Examiners erred in failing to find sufficient and adequate rehabilitation and in not according credit to Petitioner for having a long, consistent, and substantial history of good character and going above and beyond the call of duty from the time of being a child through adulthood.

58. That without reason or justification and despite good cause, the State Board of Law Examiners denied my request to extend the time to taking the oath. No reason was given for their denial.

59. That State Board of Law Examiners reasons for denying the application were on the basis of sickness and illness rather than character.

60. That although the application looks like an easy disqualification, the evidence demonstrates that the issue presented were not issue of character, but the result of a chemical imbalance.

61. That the State Board of Law Examiners is penalizing on the basis of illness rather than character.

62. That the actions of the State Board of Law Examiners and its staff are discriminatory.

63. That the State Board of Law Examiners and State Board of Law Examiner's staff treated my application with incredulity, making comments on the application materials that demonstrated and suggested that the SBLE staff, despite not being board members or having the expertise of a staff or committee, made judgments concerning the application.

64. That I was involuntarily committed to several hospitals over multi-month periods, which indicates the severity and authenticity of the illness.

65. That the State Board of Law Examiner's staff automatically assumed that my actions during the time of application stemmed from character issues rather than illness and were ill-equipped to evaluate my conduct at the time.  As a result, the State Board of Law Examiner's staff assessed my application on erroneous assumptions.

66. That I have worked diligently to rehabilitate self, and  to continue to operate within my belief system to work for the greater good.

67. That I have diligently and with great hopes worked in career fields and jobs that would be considered blue collar, manual labor, or possibly unskilled despite having a law degree, several other degrees, and having extensive work experience in the legal field and in other positions.

68. That I have not engaged in wrongful conduct or conduct with a wrong, illegal or bad intent, but have been penalized for actions stemming from a mental health disorder. I have therefore, in light of the past record and potential skepticism regarding my recent challenges with mental health, taken on positions that have required significant humility, patience, and endurance. I have been engaged in these types of work (driving for Uber and Lyft; delivering food for DoorDash; delivering food for Postmates; grocery shopping with Instacart, taking surveys on Swagbucks and Be Forthright, and Nielsen, working as a photo and card technician at District Photo – a manufacturing factory) over several years. To be clear, I have given over 300 trips and deliveries, traveled daily to the state of Pennsylvania for a three-week period in the middle of the winter to work the overnight shift at the manufacturing company, taken numerous surveys, and completed numerous grocery shops, and maintained these duties with a smile. I have been engaged in these work opportunities since 2016, despite having several degrees and extensive work experience in legal positions. I think the time period from 2016 to present demonstrates sufficient evidence of rehabilitation and should be taken in light of all the good work I did prior to being diagnosed and battling with a mental health disorder.

69. That even during the time of dealing with the mental health disorder when having active or subsiding symptoms, I worked to help others – including family members and with the Public Defender Service to help those having cases with the DC Superior Court. That I sought out volunteer opportunities and did work in a volunteer capacity with the Public Defender Service, in addition to working with the Volunteer Income Tax Assistance Program preparing taxes, and other opportunities, before the full bloom of the manic episode.

70. That much of the evidence and file reflects correspondences with the State Board of Law Examiners Staff and DC Court of Appeals, which may not have been evident, but demonstrated the subtle nuances of the mental health disorder. But for the disorder, those correspondences with the DC Bar would not have occurred. To wit, I defended an appeal (on the summary calendar) in the DC Court of Appeals. To be clear, I wrote to the Committee on the Unauthorized Practice of Law in DC and the Court of Appeals to inquire into and obtain confirmation of my bar status. I was not sought out by the Committee. I wrote to them first for advice and counsel, before the series of emails between myself and the DC Court of Appeals documented in the file.

71. That the correspondences with the DC Court of Appeals were not adjudicatory in nature, but the correspondences were primarily a string of emails I sent to the DC Committee on the Unauthorized Practice of Law, and a motion I also filed therein attempting to secure a confirmatory status for my bar standing.

72. That I have managed significant stress and have undergone eye surgery, oral surgery, in addition to managing my mental health. I have also weathered jail cells and mental health institutions, which are some of the most difficult places to navigate. Even having had these experiences, I recently worked with again, and externed with the Public Defender Service in DC. I have also worked with a solo practitioner, Andrellos Mitchell, Esq., in Washington, DC.

73. That the Committee and Board failed to consider all of the proactive actions I took during the manic episode and the curative work. To be clear, although I was in a manic episode and many difficult things happened during that time, I worked hard to preserve my dignity and integrity during the process – navigating probate proceedings, criminal cases,

and civil matters where I was filing documents with the court, writing and researching and appearing in court in defense.

74. That in the event a health issue were to be presented, built-in-checks would prevent and otherwise truncate the time for any harm to the public. The nature of the illness gives notice to others if an issue was to be presented, thus preventing undue concern with harm to the public.

75. That for ten years, upon initial diagnosis, I planned to work with a medical professional to begin the de-titration process and chose the timing based upon completing law school and handling the underlying work in therapy – believing the disorder to be a function of logic and emotions. However, upon learning and giving de-titration the ultimate try, I am convinced that the issue is chemical and can only be managed with medication. My compliance prior to 2010 and my compliance again from 2016 to present (nearing five years), demonstrates this belief and dedication to managing the mental health disorder appropriately.

76. That neither the Board, nor the Committee considered lesser sanctions such as being supervised or under probation though none of the issues stemmed from a character issue.

77. That often others seem or appear to believe that it is permissible act in ways for which I may be or am deprived of rights or privileges without consequence because of the vulnerabilities presented by the mental health challenge. As a result, I am often called to defend my situation (involuntary hospitalizations, etc.) and I have often not been given the benefit of the doubt in certain other situations (arrests from my individual personal abode and domicile as a result of phone call by someone not a resident at my abode). To be clear, others have been dismissive of my efforts and accomplishments because I have

a mental health diagnosis (presently). The inclination of many is to be condescending, patronizing, or to attempt to treat one like a child despite my having accomplished the same things as other similarly situated in all other regards (e.g., social interactions with others who are aware of the diagnosis).

78. That I have submitted evidence of my character and fitness from the time of a child, demonstrating that I have high character, moral, and values.

79. That the unanimous interim denials before the conclusion of the matters, meaning not garnering even one vote, was unfair and a group consensus that was based on illness or an unfamiliarity with mental health disorders. To this point, I provided medical evidence which was dismissed as untimely although it was relevant and timely given the context and the change in dates of the committee hearings and proceedings. The letters were obtained throughout and during the initial evaluation period.

80. That the State Board of Law Examiners automatically disqualified on the basis of disability without giving due consideration to the rehabilitation that had taken place to the point of being before the Committee and Board.

81. That often people fall on hard times, but I am essentially being punished and resigned to positions lower than which I am qualified and educated and lower level positions generally. This is particularly true because the denial of one license has a persuasive effect on other jurisdictions.

82. That the rules have changed where now there is a limit to three times for taking the MD Bar before permission has been sought.

83. That prior to passing the Bar in 2018, there were only two law-related matters that gave pause; however, upon passing the Bar issue there were greater than two because of a

subsequent manic episode for which many of the events were disclosed prior to passage. The initial two law-matters were generally referred to as "her criminal matters." Sufficient consideration was not given to the circumstances, where from 2002-2004, I was dealing with the first diagnosis of mental health and endured certain challenging situations.  To be clear, the evidence of all the volunteer work, high academic achievement, helping family, working, and creative endeavors were not given consideration and were glossed over with a broad stroke of alleged criminal activity (a simple assault charge that was nolle pros'd and a traffic violation – both stemming from my mental health issues at the time.).  Further, the later instances required explanation at the ultimate point of passing the Maryland State Bar.

84. That the State Board of Law Examiners did not give adequate consideration to the rehabilitative work done to this point and did not consider all the work and effort that goes into healing from a mental health situation.

85. That since the time of diagnosis, I have engaged in significant work and that work was not only to rehabilitate for the purpose of the Bar, but are consistent with my beliefs

86. That the letter that was sought from a medical professional appeared to be sought to disqualify, and seemed to be confirmed as such based on the State Board of Law Examiner's treatment of the Letter.  That upon information and belief, regardless of the findings in the letter, the Bar was not inclined to admit – although all issues stemmed from a mental health issue and despite the ultimate recommendation that Bar admission is proper.

87. That many Bars have considered excluding a mental health question from the application.

88. That the Committee and Board's actions were intentional with regard to discrimination and negligent and against the great weight of the evidence with regard to certain findings.

89. That I have suffered as a result of the Committee's and Board's actions.

90. That the Committee's and Board's conduct have caused me to suffer emotional distress.

91. That the State Board of Law Examiner's denied the license in interim against the evidence suggesting that there was no harm to the public for which there were built in checks and contrary to the evidence supporting a finding I am fit and have the Character to practice.

92. That my Character and Fitness evaluation was not taken seriously, where I was sent documents concerning other applicants and a file sent to me was named "Antonette Jefferson.NOT," and I was given non-committal and erroneous information by the State Board of Law Examiners.

**WHEREFORE**, I respectfully request that the court find that I have successfully fulfilled the requirements of good moral character and fitness for admission to the Maryland Bar and hereby be admitted to the Maryland Bar effective immediately, and $1,000,000 in compensatory and punitive damages.

Respectfully,

Antonette Jefferson
6101 16th Street, NW
#917
Washington, DC 20011
202-253-0797
antonettejefferson@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was transmitted to the State Board of Law Examiners on this _____ day of _____ 2020 by electronic communication.

_____
Antonette Jefferson

16